UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


KELVIN MAURICE McCRAY,

               Petitioner,

v.                                  CASE NO. 03-CV-73672-DT

LINDA METRISH,                     PAUL D. BORMAN
                                    UNITED STATES DISTRICT JUDGE

               Respondent.


_____/


**OPINION AND ORDER: 1) DENYING PETITIONER'S APPLICATION
FOR A WRIT OF HABEAS CORPUS; 2) GRANTING IN PART AND DENYING IN
PART A CERTIFICATE OF APPEALABILITY; AND 3) DENYING PETITIONER'S
RENEWED MOTION FOR AN EVIDENTIARY HEARING AND FOR THE
APPOINTMENT OF COUNSEL**


      Now before the Court is Petitioner Kelvin Maurice McCray's *pro se* application for a

writ of habeas corpus under 28 U.S.C. § 2254, challenging the constitutionality of his state-court

convictions for second-degree murder and a felony firearm offense.  Also before the Court is

Petitioner's renewed motion for an evidentiary hearing and for the appointment of counsel.

Having considered the entire record, and for the reasons that follow, the Court denies Petitioner's

application for a writ of habeas corpus, grants in part and denies in part a certificate of

appealability, and denies Petitioner's renewed motion for an evidentiary hearing and for the

appointment of counsel.

# I. BACKGROUND

Petitioner was charged in Wayne County, Michigan with first-degree murder and possession of a firearm during the commission of a felony. The charges arose from the fatal shooting of Timothy Chaney ("Chaney") on April 28, 1990, in front of 864 Philip Street in Detroit, Michigan. The prosecutor's theory was that Petitioner and his co-defendant, Orlando Scott ("Scott"), were passengers in the car from which the fatal shots were fired. Neither Defendant testified.

On October 26, 1990, a jury found Petitioner and Scott guilty of second-degree murder, M.C.L. § 750.317, and felony firearm, M.C.L. § 750.227b. The trial court sentenced Petitioner to a term of two years' imprisonment for the felony-firearm conviction and to a subsequent term of twenty-five to fifty years' imprisonment for the murder conviction.

Petitioner appealed his convictions and sentence as of right to the Michigan Court of Appeals. Petitioner raised the following claims: 1) the admission of his custodial statements to the police as evidence at trial violated the 4th Amendment; 2) his confession was the result of a lengthy delay in his arraignment such that its admission as evidence at trial violated his constitutional rights to due process of law and against self-incrimination; 3) the admission of his non-testifying co-defendant's statement inculpating him violated his constitutional rights of due process of law and confrontation; 4) the trial court's instruction to the jury on aiding and abetting constituted reversible error; and 5) his sentence was improper such that he is entitled to be re-sentenced. As relevant to the first two claims, the Michigan Court of Appeals remanded Petitioner's case for an evidentiary hearing on whether the police lacked probable cause to arrest Petitioner without a warrant and whether the police unreasonably delayed his arraignment to

2

acquire incriminating evidence. *See People v. McCray*, 210 Mich. App. 9 (1995).

On December 8, 1995, the trial court held an evidentiary hearing and found that the police possessed the requisite probable cause to arrest Petitioner, and that they did not delay his arraignment to extract incriminating evidence. On Petitioner's appeal, the Michigan Court of Appeals affirmed these findings. *See People v. McCray*, No. 193157 (Mich. Ct. App. July 8, 1997). On October 20, 1998, the Michigan Supreme Court denied Petitioner leave to appeal. *See People v. McCray*, 459 Mich. 882 (1998) (table).

On June 9, 1999, Petitioner filed his first application for a writ of habeas corpus in the Eastern District of Michigan. Seeking to exhaust other claims in the state courts, Petitioner subsequently moved to dismiss his habeas petition. On December 14, 1999, United States District Judge Patrick J. Duggan granted Petitioner's motion and dismissed the habeas petition without prejudice. *See McCray v. Abramajtys*, No. 99-CV-72924-DT (E.D. Mich. Dec. 14, 1999).

On or about April 3, 2000, Petitioner, via counsel, filed a motion for relief from judgment in the trial court based upon alleged ineffective assistance of trial and appellate counsel. Finding no merit to Petitioner's claims, the trial court denied his motion.

Petitioner appealed the trial court's denial of his motion for relief from judgment. In a motion to amend his application for leave to appeal, Petitioner alleged that the admission at trial of his non-testifying co-defendant's statement deprived Petitioner of his constitutional right of confrontation. The Michigan Court of Appeals denied Petitioner leave to amend his application for leave to appeal on the ground that Petitioner had failed to establish entitlement to relief under Michigan Court Rule 6.508(D). *See People v. McCray*, No. 241399 (Mich. Ct. App. Mar. 20,

3

2003).

Petitioner raised his claims regarding the ineffective assistance of trial and appellate counsel and the denial of his right of confrontation in the Michigan Supreme Court. On August 29, 2003, the supreme court denied Petitioner leave to appeal for failure to establish entitlement to relief under Rule 6.508(D). *See People v. McCray*, 469 Mich. 876 (2003) (table).

On September 24, 2003, Petitioner initiated this action.[1]  The five grounds for relief are as follows:

I.    Petitioner was denied his due process rights of cross-examination and confrontation where a non-testifying co-defendant's statement that implicated Petitioner was admitted into evidence at their joint trial.

II.   Petitioner was denied his constitutional right to due process of law and against self-incrimination when his inculpatory statement, which was extracted as a result of a lengthy delay in arraignment, was admitted into evidence against him at trial.

III.  Petitioner was denied his right to the effective assistance of counsel on appeal and counsel's performance on appeal provides good cause for this post appeal brief.

IV.   The police lacked probable cause for Petitioner's warrantless arrest, consequently, any evidence gained therefrom was unlawfully admitted against him, and the trial court clearly erred in finding that probable cause existed.

V.    Petitioner was denied his Sixth Amendment constitutional right to the effective assistance of trial counsel guaranteed him under the

---

[1]  The case was assigned to this Court by random draw, but reassigned to Judge Duggan pursuant to Local Rule 83.11(b)(5), which states that "[s]uccessive *habeas corpus* petitions challenging the same conviction or sentence regardless of grounds asserted shall be assigned to the Judge to whom the original petition was assigned or to the Judge who is appointed to fill the vacancy of that Judge." Following reassignment, Judge Duggan recused himself, and the case was randomly reassigned back to this Court.

4

> United States Constitution where defense counsel abandoned a
> motion to suppress a damaging statement that was obtained in
> violation of the Petitioner's Fifth Amendment right against self-
> incrimination.

Respondent filed an answer to Petitioner's application for a writ of habeas corpus.  In that answer, Respondent challenges each ground upon which Petitioner asserts an entitlement to such relief.

## II.  ANALYSIS

Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Petitioner is entitled to the writ of habeas corpus only if he can show that the state court's adjudication of his claims on the merits–

> (1)   resulted in a decision that was contrary to, or involved an unreasonable
>        application of, clearly established Federal law, as determined by the
>        Supreme Court of the United States; or
>
> (2)   resulted in a decision that was based on an unreasonable determination of
>        the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court's decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts."  *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000).  A state court's decision is an "unreasonable application of" clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  *Id.* at 413.  "Avoiding these pitfalls does not require citation of [Supreme Court] cases – indeed, it does not even

5

require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002) (*per curiam* opinion) (emphasis in original).

As the United States Court of Appeals for the Sixth Circuit has observed:

> . . . [S]tate findings of fact are presumed to be correct unless the defendant can rebut the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Finally, review is conducted in light of the law as it existed at the time of the final state court decision, *Teague v. Lane,* 489 U.S. 288 (1989), unless an intervening constitutional decision announces a 'watershed' rule of criminal law with implications for the fundamental fairness of the trial proceeding. *Caspari v. Bohlen,* 510 U.S. 383, 396 (1994).

*Baze v. Parker*, 371 F.3d 310, 318 (6th Cir. 2004), *cert. denied*, __ U.S. __, 125 S. Ct. 1670 (2005).

### A.  Co-Defendant's Statement

As to his first claim, Petitioner alleges that the admission at trial of his non-testifying co-defendant's redacted custodial statement, which substituted the word "Blank" for the names of four individuals, including Petitioner, deprived Petitioner of his constitutional right of confrontation despite the court's jury instruction to consider that statement only against his co-defendant, Scott.

Addressing this claim on direct review, the Michigan Court of Appeals stated that, "if on remand, the trial court determines that defendant McCray's inculpatory statement must be suppressed, then it was also reversible error to admit defendant Scott's redacted statement." *McCray*, 210 Mich. App. at 12.  The court of appeals, therefore, found–albeit implicitly–that the admission of Scott's redacted statement at trial violated Petitioner's right of confrontation.  As noted above, the trial court, on remand, found that Petitioner's confession was properly admitted

6

at trial, which finding was affirmed on appeal.  Following remand, the state courts made no

further mention of the admission of Scott's statement at trial.  After finding that Petitioner's

confession was admissible, the state courts apparently found no need to revisit Petitioner's

confrontation claim, presumably, based upon the reasoning that such a violation was harmless.

Petitioner raised his confrontation claim on state collateral review.  Both appellate courts

denied Petitioner leave to appeal on the ground that he failed to establish entitlement to relief.

The Sixth Amendment to the United States Constitution guarantees an accused in a

criminal prosecution the right to be confronted with the witnesses against him.  U.S. CONST.

amend. VI.  The right of confrontation applies to state criminal proceedings, and it entitles a

defendant to confront witnesses physically and to cross-examine them.  *Davis v. Alaska*, 415

U.S. 308, 315 (1974).  In *Bruton v. United States,* 391 U.S. 123 (1968), the Supreme Court held

that a defendant's right of confrontation is violated "when his non-testifying co-defendant's

statement naming him as a participant in the crime is introduced at their joint trial, even if the

jury is instructed to consider that confession only against the co-defendant."  *Richardson v.

Marsh,* 481 U.S. 200, 201 (1987).  The *Bruton* Court reasoned that, in such a situation, "the risk

that the jury will not, or cannot, follow instructions is so great, and the consequences of failure

so vital to the defendant" that limiting instructions are inadequate.  391 U.S. at 135-37.

In *Richardson v. Marsh,* the Supreme Court held that a defendant's right of confrontation

is not violated, under the *Bruton* rule, "by the admission of a non-testifying co-defendant's

confession with a proper limiting instruction when . . . the confession is redacted to eliminate not

only the defendant's name, but any reference to his or her existence."  481 U.S. at 211.  The

Court underscored that, unlike in *Bruton,* the co-defendant's confession did not incriminate the

7

defendant on its face but, rather, incriminated the defendant only when linked inferentially with

other evidence at trial.  *Id.* at 208.  The Court further reasoned:

> Where the necessity of such linkage is involved, it is a less valid generalization
> that the jury will not likely obey the instruction to disregard the evidence.
> Specific testimony that 'the defendant helped me [to] commit the crime' is more
> vivid than inferential incrimination, and hence more difficult to thrust out of the
> mind.  Moreover, with regard to such an explicit statement the only issue is, plain
> and simply, whether the jury can possibly be expected to forget it in assessing the
> defendant's guilt; whereas with regard to inferential incrimination[,] the judge's
> instruction may well be successful in dissuading the jury from entering onto the
> path of inference in the first place, so that there is no incrimination to forget.  In
> short, while it may not always be simple for . . . a jury to obey the instruction that
> they disregard an incriminating inference, there does not exist the overwhelming
> probability of their inability to do so that is the foundation of *Bruton*'s exception
> to the general rule

*Id.*  The Court expressly declined to address "the admissibility of a confession in which the

defendant's name has been replaced with a symbol or neutral pronoun."  *Id.* at 211 n.5.

The Court, however, answered this open question in *Gray v. Maryland,* 523 U.S. 185

(1998).[2]  In *Gray,* the Supreme Court held that a defendant's right of confrontation is violated,

even with a proper limiting instruction, by the admission of a non-testifying co-defendant's

confession that substitutes a blank space or the word "deleted" for the defendant's name in the

confession.  *Id.* at 188.  The Court underscored that, unlike the redacted confession in

*Richardson* and like the unredacted confession in *Bruton*, the co-defendant's confession directly

referred to the defendant's existence, was directly accusatory, and was facially incriminating.  *Id.*

at 192, 194, 196.  The Court further reasoned:

---

[2]  *Gray v. Maryland* was not "clearly established federal law" at the time of Petitioner's
trial in 1990.  However, to the extent that *Gray v. Maryland* announced a new rule for criminal
prosecutions, it applies retroactively because Petitioner's case was pending on direct review and
not yet final when the Supreme Court decided *Gray v. Maryland*.  *See Griffith v. Kentucky*, 479
U.S. 314, 328 (1987).

8

. . . [A] jury will often react similarly to an unredacted confession and a confession redacted [to replace a defendant's name with an obvious indication of deletion] . . . for the jury will often realize that the confession refers specifically to the defendant.  This is true even when the state does not blatantly link the defendant to the deleted name . . . .  A juror somewhat familiar with criminal law would know immediately that the blank . . . [in the co-defendant's statement] refers to [the] defendant . . . .  A juror who does not know the law and who therefore wonders to whom the blank might refer need only lift his eyes to . . . [the defendant], sitting at counsel table, to find what will seem the obvious answer, at least if the juror hears the judge's instruction not to consider the confession as evidence against . . . [the defendant], for that instruction will provide an obvious reason for the blank.  A more sophisticated juror, wondering if the blank refers to someone else, might also wonder how, if it did, the prosecutor could argue [that] the [co-defendant's] confession is reliable, for the prosecutor, after all, has been arguing that . . . [the defendant], not someone else, helped . . . [the co-defendant to] commit the crime.

*Id.* at 193.[3]

Petitioner alleged the following in his first custodial statement to police.  On the day in question, Devon Jackson ("Jackson") learned that someone had "ripped off one of his joints." (Tr. Oct. 24, 1990 at 117.)  Jackson asked Petitioner, Oyd McCray, Petitioner's cousin, Jeff Johnson ("Johnson"), and Scott[4] to follow him to "find out what happened."  (*Id.*)  Oyd McCray drove Petitioner's dark-green Acura Legend, in which Petitioner sat on the front passenger's side, Johnson sat on the rear driver's side, and Scott sat on the rear passenger's side.  (*Id.*)  Petitioner's car followed Jackson's blue Buick, which Jackson was driving and in which another individual was a passenger, down Philip Street in Detroit.  (*Id.*)  Upon being flagged by Jeffrey

---

[3]  Petitioner urges the Court to take into consideration *Crawford v. Washington*, 541 U.S. 36 (2004).  *Crawford*, however, was not clearly established federal law at the time of Petitioner's trial, and the Sixth Circuit recently stated that *Crawford* is not retroactive on habeas review.  *See Dorchy v. Jones*, 398 F.3d 783, 788 (6th Cir. 2005).  Furthermore, an argument under *Crawford* is subsumed by *Bruton* and its progeny.

[4]At trial, Petitioner's first statement was redacted to identify Scott as "Blank."

Cannon ("Cannon"), who was standing in a vacant lot adjacent to the house at 864 Philip Street, Petitioner's car made a u-turn and pulled up next to the curb by the house.  (*Id.* at 118.)

Oyd stated that Chaney looked "like the guy who has been robbing the joints."  (*Id.*)  As Scott was calling Chaney over to the car and accusing him of the robberies, Petitioner noticed Devon's car pull up behind Petitioner's car.  (*Id.*) As Chaney was stepping back, he was reaching under his jacket as though for a weapon.  (*Id.* at 119.)  Petitioner saw Chaney with a "silver big gun."  (*Id.* at 121.)  Petitioner saw an individual on the porch with a shot gun.  (*Id.* at 122.)  Petitioner then heard gunshots coming from behind him.  (*Id.*)  The cars fled the scene.  (*Id.*)  Petitioner later asked Jackson why he was shooting, and Jackson said, "The guy had a gun, so I started shooting."  (*Id.*)  Jackson also stated that it looked like Chaney was going to shoot at Petitioner's car.  (*Id.* at 122.)  Petitioner saw a bullet hole in Jackson's car.  (*Id.* at 119.)  According to Petitioner, no one in his car, including Petitioner, was armed or shot at Chaney. (*Id.* at 119, 121.)

Petitioner alleged the following in his second statement.  Petitioner, Oyd McCray, Jackson, Johnson, and Scott,[5] were driving down Philip Street in Petitioner's car to Jackson's "joint" that was robbed when Cannon flagged them down, they made a u-turn, and pulled in front of the house.  (*Id.* at 125.)  Petitioner was driving, Jackson sat in the front passenger's seat, Scott sat in the rear passenger's seat, and Johnson sat in the rear driver's seat.  (*Id.*)  After Scott called Chaney to the car and accused him of the robberies, Chaney stepped back and reached under his coat.  (*Id.* at 126.) Petitioner saw a man about to exit the house with a shot gun.  (*Id.*) Jackson fired one shot at Chaney, and Petitioner started to drive off.  (*Id.* at 127.)  As Petitioner

_____

[5]At trial, Petitioner's second statement was redacted to identify Scott as "Blank."

10

was driving off, Jackson fired four or five more shots.  (*Id.*)  No one saw a gun on Chaney.  (*Id.*)
Jackson was the only one who was armed in Petitioner's car.  (*Id.*)  There was only one car
involved in the shooting.  (*Id.* at 129.)

Petitioner alleged the following in his third and final statement to police.  Petitioner, the
front passenger; Oyd McCray, the driver; Johnson, sitting on the rear driver's side; and Scott,[6]
sitting on the rear passenger's side, drove in Petitioner's car to Philip Street.  (*Id.* at 133.)
Petitioner's car followed Jackson's car, in which Jackson was alone.  (*Id.*)  Upon being flagged
by Cannon, Petitioner's car made a u-turn and pulled in front of the house.  (*Id.* at 134.)  After
Scott called Chaney to the car and accused him of the robberies, Chaney began backing up.  (*Id.*
at 135.)  Upon seeing a man run into the house, Petitioner pulled out a 380 semi-automatic from
the glove compartment.  (*Id.*)  The man exited the house with a rifle or a shot gun.  (*Id.* at 136.)
Seeing the man exit the house, Chaney reached under his jacket as if for a weapon.  (*Id.* at 135.)
Petitioner fired four or five shots at Chaney. (*Id.*)  Only Petitioner was armed in or fired shots
from his car. (*Id.* at 137.)

At trial, co-defendant Scott's statement was read into evidence.[7]  (Tr. Oct. 23, 1990, at
94-103).  The statement was redacted so that Petitioner's name was replaced by the word
"Blank," as were the names of three other individuals.  In his statement, Scott alleged that, on the
day in question, he and several "Blanks" drove, in two cars, to Philip Street because they learned
that the individuals who had been robbing the "dope houses" were there.  (*Id.* at 97.)  Scott

---

[6]At trial, Petitioner's final statement was redacted to identify Scott as "Blank."

[7]The prosecutor, defense counsel, and the trial court advised the jury that they could not
use a co-defendant's statement against the other defendant.  (Tr. Oct. 23, 1990, at 94;  Tr. Oct.
24, 1990, at 200, 221-22; Tr. Oct. 25, 1990, at 282-83.)

alleged that, as the Acura Legend was making a u-turn upon being flagged by individuals at the house, Scott flagged the car down, and got into the car on the rear passenger's side. (*Id.*) According to Scott, when the car pulled up to the house, Scott demanded money from Chaney for the robberies.  (*Id.*)  Scott stated that Chaney looked at "Blank and then started to run."  (*Id.*) Scott alleged that "Blank had a nine millimeter and a 380 in the glove box," and passed Scott the nine millimeter.  (*Id.* at 98.)  Scott claimed that, as Chaney was running, "Blank" shot four or five times at him.  (*Id.*)  Scott alleged that only he and "Blank" were armed in the car.  (*Id.* at 99.)  According to Scott, only "Blank" pointed the gun at Chaney and only "Blank" fired shots at Chaney.[8]  (*Id.* at 100.)  Thus, the jury learned from Scott's redacted statement that a single "Blank," and no one else in the car in which Scott was riding, shot at the victim.  (*Id.* at 98-99.)

The state-court decision that the admission of Scott's redacted statement at trial violated Petitioner's right of confrontation is not an unreasonable application of *Bruton* and its progeny. Respondent argues that, because Scott's redacted statement replaced four different names, including Petitioner's, with the word "Blank," it was "all but impossible for the jury to tell to whom the blanks referred."  (Resp. at 7.)  However, in *Gray,* the co-defendant's statement redacted two names, including the defendant's, with the word "deleted."  523 U.S. at 196. Paying little heed to the obvious redaction of more than one individual's name, the Supreme Court held that the admission of the co-defendant's statement violated the defendant's right of confrontation.  *Id.* at 197.  Indeed, the *Gray* Court noted:

.        . . [I]n some instances, the person to whom the blank refers may not be clear: . . .

---

[8]In his statement, Scott alleged that he questioned "Blank" about why he was being handed the gun, that he gave "Blank" the gun back, and that he questioned "Blank" about why he shot the gun.  (*Id.* at 98, 100-01.)

the reference might not be transparent in . . . cases in which a confession, like the present confession, uses two (or more) blanks, even though only one other defendant appears at trial, and in which the trial indicates that there are more participants than the confession has named.  Nonetheless, as we have said, we believe that, considered as a class, redactions that replace a proper name with an obvious blank, the word 'delete,' a symbol, or similarly notify the jury that a name has been deleted are similar enough to *Bruton*'s unredacted confessions as to warrant the same legal results.

*Id.* at 194-95.

Here, Scott's statements make clear that the single "Blank" sitting on the passenger's side of the Acura Legend shot Chaney after passing a gun to Scott, sitting on the rear passenger's side.  If the jury had any doubts as to who shot Chaney and to whom this particular "Blank" referred, the jury need only lift their eyes to Petitioner, the only other "Blank" on trial with Scott. Indeed, the prosecutor argued that Scott and/or Petitioner shot Chaney, and that, in any event, both were equally culpable for Chaney's murder.  (Trial Oct. 24, 1990 at 211-12.)  *See Gray*, 523 U.S. at 188-89, 193 (noting that the government blatantly linked the defendant to one of the deleted names after the redacted confession was read into evidence).  The Court, therefore, concludes that the state-court determination that the admission of Scott's statement at trial violated Petitioner's right of confrontation was not an unreasonable application of clearly-established federal law.

The state-court decision that such a violation constituted harmless error was also not an unreasonable application of clearly-established federal law.  The Sixth Circuit summarized relevant Supreme Court decisions as follows:

Where a *Bruton* violation occurs, a court must then determine whether that violation is harmless.  The court must decide "'whether the minds of an average jury'" would have found the State's case against a defendant "'significantly less persuasive'" had the incriminating portion of the co-defendant's statement been excluded.  *Hodges*, 570 F.2d at 643 (quoting *Schneble v. Florida*, 405 U.S. 427,

13

> 432 (1972)).  Relief may be granted on collateral review only if the trial error
> "had substantial and injurious effect or influence in determining the jury's verdict.
> Under this standard, habeas petitioners . . . are not entitled to habeas relief based
> on trial error unless they can establish that it resulted in 'actual prejudice.'"
> *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (internal quotation and citation
> omitted).

*Stanford v. Parker*, 266 F.3d 422, 455-56 (6th Cir. 2001), *cert. denied*, 537 U.S. 831 (2002). *See*

*also Harrington v. California*, 395 U.S. 250 (1969) (determining that a *Bruton* error may be

harmless if there is overwhelming untainted evidence to support the conviction).

Petitioner contends that the admission of Scott's statement in violation of Petitioner's

right of confrontation completely destroyed Petitioner's defense that he did not shoot Chaney

and that he in no way participated in that shooting.  (Br. at 6.)  At trial, Petitioner argued that his

first statement to police was true, and that his subsequent statements to the police were fabricated

because of the alleged coercive circumstances surrounding them, such as Petitioner's prolonged

detention and his delayed arraignment.  (Trial Oct. 24, 1990 at 232-35.)  Thus, Petitioner only

"stood by" his first statement to the police, and challenged the credibility of his subsequent

statements.  Petitioner maintains that Scott's statement corroborated Petitioner's last statement to

the police in "all essential respects" such that the admission of Scott's statement made

Petitioner's confession more believable in the jury's eyes.  (Br. at 5-6.)   Specifically, Petitioner

argues that both statements provide that there were four people in Petitioner's car; the gun used

to shoot Chaney came from the glove box of Petitioner's car; and that Petitioner shot Chaney.

(Br. at 6.)  According to Petitioner, but for the admission of Scott's corroborating statement, the

jury would have completely discredited Petitioner's confession.  In support, Petitioner contends

that his confession was the only admissible evidence against him that identified him as the

shooter. (Br. at 7.)

14

The prosecutor's theory was that Petitioner and Scott went to Philip Street to vindicate the robberies of Jackson's "joints" (Tr. Oct. 24., 1990 at 202-05.); both Petitioner, as the front passenger, and Scott, sitting on the rear passenger's side, were armed (*Id.* at 217-18.); Petitioner and/or Scott[9] fired shots at Chaney since all of the witnesses saw shots coming from the car's passenger side (*Id.* at 200, 212.); the shooting was not in self-defense because Chaney was shot in the back while ducking and running away and none of the neighborhood witnesses saw Chaney or anyone outside of the car with a weapon (*Id.* at 199, 208, 218.); and that Petitioner was either a principal or an aider and abetter in Chaney's murder (*Id.* at 198, 213.)

As noted above, in Petitioner's first statement to police, which he was "standing by" and which he conceded was voluntary, Petitioner alleged that, at the time of the shooting, Petitioner's car, in which Petitioner was the front passenger, had pulled up to the curb by the house on Philip Street; Jackson's blue Buick had pulled up behind Petitioner's car.  (Tr. Oct. 24, 1990 at 117, 232, 235.)  Petitioner stated that Chaney reached under his jacket as though for a weapon; Petitioner saw Chaney with a "silver big gun"; and that Petitioner saw an individual on the porch with a shot gun.  (*Id.* at 119, 121-22.)  According to Petitioner, Jackson shot Chaney from his car, and no one in Petitioner's car, including Petitioner, was armed or shot at Chaney.  (*Id.* at 119, 121-22.)   Petitioner stated that Jackson shot Chaney because he believed that Chaney was going to shoot at Petitioner's car.  (*Id.* at 122.)  Thus, Plaintiff's own statement placed him in the passenger side of his car.

---

[9]The parties stipulated that all of the shell casings found at the scene came from the same gun.  (Tr. Oct. 23, 1990 at 107.)  The prosecutor argued, however, that one of the Defendants could have fired a gun that did not discharge casings, such as a nine millimeter revolver handgun. (Tr. Oct. 22, 1990, at 78, 89; Tr. Oct. 24, 1990, at 212.)

15

Sheryl and Floyd Massey testified that they saw four to five shots come from the passenger's side of the dark-green Acura Legend. (Tr. Oct. 22, 1990 at 76, 81, 88, 96, 98, 103.) Anthony Cannon testified that he saw shots coming from the passenger's side and that, although he was not sure, he believed that they came from the front passenger's side. (Tr. Oct. 22, 1990 at 156.) The parties stipulated that Thomas Horton would have testified that he saw four or five shots come from the passenger's side of the car. (Tr. Oct. 24, 1990 at 162.)

Sheryl Massey, Floyd Massey, and Kimberly Wilson testified to having seen only Petitioner's car. (Tr. Oct. 22, 1990 at 82, 102, 119.) While Anthony Cannon, Kimberly Wilson, and Jeffrey Cannon testified that the car from which the shots came was gray, (Tr. Oct. 22, 1990 at 119, 159, 161; Tr. Oct. 23, 1990 at 8.), there is substantial evidence, as the Prosecutor pointed out, of only one car having been at the scene. Moreover, Jeffrey Cannon testified that "Head," whom he identified as Petitioner, was in a gray car and that the shots came from that car. (Tr. Oct. 23, 1990 at 7, 9, 15.) The parties stipulated that Thomas Horton would have testified that the shots came from a green or gray car. (Tr. Oct. 24, 1990 at 162.) Thus, there is overwhelming untainted evidence that Petitioner was in the car from which the shots came, regardless of how it was described.

Kimberly Williams and Jeffrey Cannon testified that they did not see Chaney or any of the individuals outside of the car with a weapon (Tr. Oct. 22, 1990 at 117; Tr. Oct. 23, 1990 at 15-16.) Anthony and Jeffrey Cannon testified that Chaney had turned and began to run before the shots were fired. (Tr. Oct. 22, 1990, at 154-55; Tr. Oct. 23, 1990 at 14.) The parties stipulated that Chaney was shot in the back. (Tr. Oct. 23, 1990 at 107.)

Contrary to his first statement to police, Petitioner, at trial, suggested that he might have

16

been the driver of the car.  Jeffrey Johnson and Jeffrey Cannon testified that Petitioner was the

driver of the car at the time of the shooting.  (Tr. Oct. 23, 1990 at 9, 28, 20, 50-51; Tr. Oct. 24,

1990 at 165, 182.)  However, the parties stipulated that Oyd McCray would have testified that he

was the driver of the car.  (Tr. Oct. 24, 1990 at 163.)  Moreover, at one point, Jeffrey Cannon

testified that he was merely guessing that Petitioner was driving the car after the car made the u-

turn and pulled up to the house.  (Tr. Oct. 23, 1990 at 47-48.)  Of special note, Petitioner's

statement to police that he affirmed belied his belated suggestion that he might have been the

driver of the car.

The state courts determined that any *Bruton* violation arising from the admission of

Scott's statement at trial did not have a substantial and injurious effect or influence upon the

jury's verdict.  Based upon Petitioner's affirmation of his first statement to police, the substantial

evidence contradicting that statement's exculpatory portions, and the overwhelming evidence

inculpating Petitioner as having been armed and either a principal or an aider and abetter in

Chaney's murder, the Court cannot conclude that the state-court finding of harmless error was an

unreasonable application of clearly-established federal law.

### B.  Delay in Arraignment

As to his second claim, Petitioner alleges that the admission of his confession in evidence

deprived him of his rights under the Fourth, Fifth, Sixth, and Fourteenth Amendments to the

United States Constitution.  In support, Petitioner asserts that the police delayed his arraignment

so that they could extract an inculpatory statement from Petitioner and gather additional

evidence to justify his arrest.

### 1.  The Fourth Amendment Claim

17

In *Gerstein v. Pugh*, 420 U.S. 103 (1975), the Supreme Court held "that the Fourth Amendment requires a judicial determination of probable cause as a prerequisite to extended restraint of liberty following arrest" and that "this determination must be made by a judicial officer either before or promptly after arrest."  *Id.* at 114, 125.  In *Riverside v. McLaughlin*, 500 U.S. 44 (1991), the Supreme Court stated that "a jurisdiction that provides judicial determinations of probable cause within 48 hours of arrest will, as a general matter, comply with the promptness requirement of *Gerstein*."  *Id.* at 56.

Although Petitioner was held considerably longer than 48 hours before being arraigned, *Stone v. Powell*, 428 U.S. 465 (1976), generally bars federal habeas review of Fourth Amendment claims.  In *Stone,* the Supreme Court held that Fourth Amendment claims may not be brought in a habeas petition if the petitioner had a full and fair opportunity to raise his claim in state court.  *Id.*  Petitioner raised the instant Fourth Amendment claim in the trial court, which, after holding an evidentiary hearing, found that the police did not unreasonably delay Petitioner's arraignment to acquire incriminating evidence.  The Michigan Court of Appeals affirmed this finding, which the Michigan Supreme Court denied Petitioner leave to appeal.

Petitioner argues that he did not have a full and fair hearing in state court because the state courts failed to apply *Riverside v. McLaughlin*.  Relying upon *Gamble v. Oklahoma*, 583 F.2d 1161, 1165 (10th Cir. 1978), Petitioner asserts that a full and fair opportunity requires the recognition and application of the correct constitutional standard.  The Sixth Circuit, however, has declined to adopt the position that federal habeas courts must review Fourth Amendment claims to determine if there was an egregious error.  *See Riley v. Gray*, 674 F.2d 522, 525-26 (6th Cir. 1982).  According to the Sixth Circuit, district courts, in reviewing Fourth Amendment

18

claims in habeas proceedings, must inquire into: 1) whether the state's procedural mechanism presented the opportunity to raise a Fourth Amendment claim, and 2) whether a failure of that mechanism frustrated the opportunity to present the claim. *Id*. at 526.

Petitioner does not dispute that he had an opportunity to present his Fourth Amendment claim in a fact-finding hearing in the trial court and on direct appeal of the trial court's unfavorable decision. The more difficult question is whether the state courts' alleged failure to discuss and apply *Riverside v. McLaughlin* resulted in a failure of the state's procedural mechanism. Although *Riverside v. McLaughlin* had not been decided at the time of Petitioner's arrest or trial, it was clearly established law by the time of Petitioner's evidentiary hearing and subsequent appeal. Indeed, by then, the Supreme Court had determined that "*Griffith v. Kentucky* calls for retroactive application of *McLaughlin's* 48-hour rule" on direct review. *See Powell v. Nevada*, 511 U.S. 79, 85 (1994).

Nevertheless, "'full and fair' guarantees the right to present one's case[;] it does not guarantee a correct result." *Cabrera v. Hinsley*, 324 F.3d 527, 532 (7th Cir.), *cert. denied*, 540 U.S. 873 (2003). Determining whether the state court "'applied the proper constitutional law' would require the very review of the state court record that the *Stone* rule is intended to circumvent." *Willett v. Lockhart*, 37 F.3d 1265, 1271 (8th Cir. 1994). "The federal courts on habeas review of [Fourth Amendment] claims are not to consider whether full and fair litigation of the claims in fact occurred in the state courts, but only whether the state provided an opportunity for such litigation." *Id*. at 1273. Second-guessing the state courts on the merits of a petitioner's claim would be inconsistent with *Stone v. Powell*. *Gilbert v. Parke*, 763 F.2d 821, 824 (6th Cir. 1985).

19

The Court concludes that Petitioner had a full and fair opportunity to raise in state court his Fourth Amendment claim that his confession was a product of his delayed arraignment. The doctrine of *Stone v. Powell* bars substantive review of this claim.

## 2. The Voluntariness of Petitioner's Confession

Petitioner's Fifth and Fourteenth Amendment claims regarding his delayed arraignment are not barred from such review. The Fifth Amendment, which is applicable to the States through the Fourteenth Amendment, *Malloy v. Hogan*, 478 U.S. 1, 3 (1964), provides that "[n]o person shall be . . . compelled in any criminal case to be a witness against himself. . . ." Petitioner alleges that his constitutional rights were violated because his inculpatory statement was extracted as a result of a lengthy delay in the arraignment.[10]

A confession made during a delay in the arraignment is not necessarily inadmissible; the delay is merely one factor to be considered in determining voluntariness. *Lundberg v. Buchkoe*, 338 F.2d 62, 69 (6th Cir. 1964). Among the factors that the Court must consider in determining whether Petitioner's confession was voluntary are whether: 1) he was advised of his constitutional rights to remain silent, to consult counsel, to have counsel appointed, if necessary, and that anything he said could be used against him at trial;[11] 2) he was subjected to prolonged interrogation specifically designed to elicit a signed statement of "the truth" as the police viewed it; and 3) whether his faculties were impaired by inadequate sleep and food, sickness, and long subjection to police custody with little or no contact with anyone other than the police. *Clewis v.*

---

[10] In his first two statements to the police, Petitioner denied being armed, but in his third statement, he admitted shooting Chaney.

[11] *See Miranda v. Arizona*, 384 U.S. 436, 444-45 (1966).

*Texas*, 386 U.S. 707, 711-712 (1967).  The third factor can take on additional weight if the petitioner had little education and no familiarity with the law. *Id.* at 712.

Petitioner was arrested on May 7, 1990, at 12:15 a.m., and the police first questioned him eighteen hours later at 6:05 p.m.  Petitioner denied responsibility for the crime, and was sent back to the police lock-up.  Police Officer Donald Stawiasz ("Officer Stawiasz") took a second statement from Petitioner the following morning on May 8, 1990.  After claiming that another individual in his car was the shooter, Petitioner was sent back to the lock-up.  Officer Stawiasz took a third statement from Petitioner on the morning of May 9, 1990.  During this third and final statement, Petitioner confessed to shooting Chaney.  A warrant for Petitioner's arrest was prepared, and he was arraigned the following day on May 10, 1990.  According to Petitioner's calculation, he was held without a warrant for eighty hours before his arraignment.

On direct review, the trial court found that there was no evidence that the police delayed Petitioner's arraignment to extract an incriminating statement from him, and, indeed, that the testimony of the police officers showed otherwise.[12]  (Tr. Dec. 8, 1995, at 29-30).  In so finding, the trial court implicitly determined that Petitioner's confession was voluntary.  The Michigan Court of Appeals affirmed this finding.

Petitioner has shown neither that the delay in his arraignment rendered his confession involuntary nor that the relevant state-court decision was contrary to or an unreasonable application of clearly-established federal law.  As explained more fully below in section II.E.2., Petitioner was advised of his constitutional rights, including his rights to remain silent and to

---

[12]Because the trial court apparently believed the police officers' testimony, this Court must defer to the trial court's conclusions regarding witnesses' credibility.  *See Miller v. Fenton,* 474 U.S. 104, 116-17 (1985).

21

counsel, before each statement, and he waived those rights. Petitioner was not subjected to prolonged interrogation by numerous officers. Although he was interviewed three times, each interrogation was on a different day and by the same officer. There is no evidence that the police delayed Petitioner's arraignment to gather additional evidence to justify his arrest. Rather, the police had probable cause to believe that Petitioner had committed a crime when they arrested him. *See infra* section II.C.[13] Lastly, nothing in the record indicates that Petitioner's faculties were impaired by lack of sleep or food, physical abuse, or by the overbearing of his will.

In sum, Petitioner was advised of his constitutional rights, including his right to counsel; he waived those rights; he was not subjected to prolonged interrogation; he was not mistreated; and he informed Officer Stawiasz that his statements were voluntary and freely given. Petitioner also told Stawiasz that the police had neither threatened him nor promised him anything for making the statements. (Tr. Oct. 24, 1990, at 131-32). The Court concludes that Petitioner is not entitled to habeas relief on his claim that the delay in his arraignment violated his rights under the Fifth and Fourteenth Amendments.

### C.  Appellate Counsel

As to his third claim, Petitioner alleges that he was denied his constitutional right to the

---

[13] Officer Stawiasz testified at the evidentiary hearing that he kept Petitioner for three days without arraigning him because the police were trying to locate and talk to other people, that there was a conflict in Petitioner's statement, which he wanted to straighten out, and that he wanted to make sure that he had the right person. However, Stawiasz denied using the delay in the arraignment to extract a confession from Petitioner. In fact, he stated that he thought that he had enough information to charge Petitioner after his second statement to police. (Tr. Dec. 8, 1995, at 12-13.)

effective assistance of appellate counsel.  Specifically, Petitioner contends that his appellate attorney, at the post-conviction evidentiary hearing, failed to argue that Cannon's description of Petitioner and his car were inaccurate such that the police lacked the requisite probable cause to arrest Petitioner.  According to Petitioner, if the state court had determined that there was no probable cause to arrest him, his confession would have been suppressed and he would not have been charged with the shooting.

Although petitioners generally may not raise Fourth Amendment claims on federal habeas review, they may assert Sixth Amendment claims based on counsel's failure to move for the suppression of evidence that should have been excluded under the Fourth Amendment. *Northrop v. Trippett*, 265 F.3d 372, 378 (6th Cir. 2001).  To establish the ineffective assistance of counsel under the Sixth Amendment, a habeas petitioner must demonstrate that counsel's performance was deficient and that the deficient performance actually prejudiced him. *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  In the context of Fourth Amendment claims, a petitioner demonstrates "actual prejudice" by "prov[ing] that his Fourth Amendment claim is meritorious and that there is a reasonable probability that the verdict would have been different absent the excludable evidence. . . ."  *Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986).

The trial court was the last state court to adjudicate Petitioner's ineffective-assistance-of-appellate-counsel claim on the merits.  The court neither cited *Strickland v. Washington* or *Kimmelman v. Morrison* nor made any specific findings on the assistance of Petitioner's appellate counsel.  However, the trial court did conclude that the instant claim lacked merit.  The issue on habeas review is whether the state court's rejection of Petitioner's ineffective-

23

assistance-of-appellate-counsel claim was an unreasonable application of clearly-established federal law as determined by the Supreme Court. *Cyars v. Hofbauer*, 383 F.3d 485, 491 (6th Cir. 2004), *cert. denied*, __ U.S. __, 125 S. Ct. 1709 (2005).

Petitioner was arrested without a warrant. "As a general rule, a defendant can be arrested without a warrant only if probable cause to arrest exists at the time of the arrest." *United States v. Porter*, 701 F.2d 1158, 1165 (6th Cir. 1983) (citing *Beck v. Ohio*, 379 U.S. 89, 91 (1964), and *United States v. Calandrella*, 605 F.2d 236, 246 (6th Cir. 1979)). The Supreme Court has defined "probable cause" as facts and circumstances "sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense." *Beck v. Ohio*, 379 U.S. at 91.

Cannon identified a participant in the shooting as "Head," and described "Head" to the police as a dark-complected black male in his early twenties, five feet nine inches tall, with a heavy build, bald head, and a thin mustache. Cannon described the car involved in the shooting as a light gray Toyota with gold star-type wheels and gold trim around the wheel wells. The day after Cannon provided this description, the police arrested Petitioner and described him in their interrogation record as a dark-complected black male, age twenty-one, five feet six inches tall, with a medium build, short hair, and no mustache. Other eyewitnesses to the crime described the car involved in the shooting as a dark green Acura with star wheels and a radio antenna.

Despite the discrepancies between Cannon's description of "Head" and his car and the descriptions provided by other eyewitnesses and the police, Cannon knew "Head" well, and he was able to lead the police to three houses associated with him. At one of the houses, the police saw a car, which resembled the car described by eyewitnesses and Cannon as being involved in

24

the shooting.  In addition, the police had performed a computerized search and determined that the McCray family owned an Acura.  Believing that Petitioner matched the description given to them, the police arrested Petitioner, who was in possession of the keys to the car parked in the driveway, as he exited the back door of the house.

The Michigan Court of Appeals concluded that the information that the police possessed constituted "ample probable cause" to arrest Petitioner.  This Court agrees that the information that the police acquired was sufficiently trustworthy to warrant a prudent person in believing that Petitioner had committed an offense.  Appellate counsel's failure to attack Cannon's pretrial descriptions of "Head" and his car, at the post-conviction evidentiary hearing, did not prejudice Petitioner's appeal.  Of special note, Cannon identified Petitioner as "Head" at trial, and the Michigan Court of Appeals determined that state law did not require a showing of Cannon's reliability because he was an eyewitness to the shooting.  The state court's denial of Petitioner's ineffective-assistance-of-appellate-counsel claim was not an unreasonable application of clearly-established federal law.

### D.  The Fourth Amendment Claim

As to his fourth claim, Petitioner alleges that the police lacked the requisite probable cause to arrest him and that, therefore, the admission of Petitioner's statements to the police at trial violated his Fourth Amendment rights.  In support, Petitioner contends that the police had no information that linked him to the shooting.

The Fourth Amendment protects against "unreasonable searches and seizures."  U.S. Const. amend. IV.  A police "officer cannot arrest an individual absent probable cause, i.e., a 'fair probability' that the individual has either committed or intends to commit a crime."

25

*Northrop*, 265 F.3d at 379 (citing *United States v. Sokolow*, 490 U.S. 1, 7 (1989)).  However, as noted above, the Supreme Court, in *Stone v. Powell*, 428 U.S. at 482, held that, when "the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, the Constitution does not require that a state prisoner be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial."  "All that *Stone v. Powell* requires is an 'opportunity' for full and fair consideration of the claim for suppression. . . ." *Jennings v. Rees*, 800 F.2d 72, 77 (6th Cir. 1986).  "For such an opportunity to have existed, the state must have provided, in the abstract, a mechanism by which to raise the claim and the presentation of the claim . . . must not have been frustrated by a failure of that mechanism." *Gilbert v. Parke*, 763 F.2d at 823 (citing *Riley,* 674 F.2d at 526).

Petitioner raised his Fourth Amendment claim surrounding the alleged lack of probable cause to arrest him on direct appeal from his convictions.  The Michigan Court of Appeals remanded the case for an evidentiary hearing on whether the police, in fact, lacked such probable cause.  After holding an evidentiary hearing, the trial court determined that the police possessed the necessary probable cause because:

> [t]hey had been given information, they had been given a nickname, there was a car that they ran through the computer that came out with the name McCray; they had a nickname, they had a description, they went to the house, they saw the Defendant and they saw a gun.

(Tr. Dec. 8, 1995, at 29.)

Petitioner appealed the trial court's decision as of right.  The Michigan Court of Appeals summarized the testimony at the evidentiary hearing as follows:

> [T]he officer who orchestrated defendant's arrest testified that, after investigating the shooting death of Timothy Chaney, he had arrested Jeffrey Cannon.  Cannon agreed to cooperate with the police, and informed the officer that the shooting had

26

been perpetrated by "Head," who drove a dark green Acura automobile with star wheel covers and a radio antenna.  Cannon then led the officer to each of three residence addresses associated with "Head," and provided a description of "Head."  Some of this information dovetailed with that supplied by other witnesses.  Eventually, a team of police officers approached one of these residences at which the described vehicle was observed, and as they did so defendant emerged from the rear door of the premises and was taken into custody.  Defendant matched the description of "Head" and was later identified at trial by Jeffrey Cannon as being "Head."

*McCray*, Mich. Ct. App. No. 193157, at 1.  The court of appeals concluded that "[t]his information constituted ample probable cause to arrest [Petitioner]" under *Beck v. Ohio.*  Petitioner raised the instant claim in the Michigan Supreme Court, which denied Petitioner leave to appeal.

Petitioner contends that he did not have a full and fair opportunity at the evidentiary hearing to demonstrate that the police lacked probable cause to arrest him because he was unable to point out the inaccuracies in Cannon's description of "Head" and the car involved in the shooting.  However, for the reasons stated above, such a contention is unpersuasive.  The Court concludes that Petitioner was accorded a full and fair opportunity, at all levels of state-court review, to assert his Fourth Amendment claim concerning probable cause to sustain his arrest.  Therefore, *Stone v. Powell* precludes the Court from reviewing that claim on the merits.

### E.  Trial Counsel

As to his final claim, Petitioner alleges that he was denied his constitutional right to the effective assistance of trial counsel.  Specifically, Petitioner points to his trial counsel's abandonment of a motion to suppress Petitioner's custodial statements, which motion alleged that the police obtained those statements in violation of Petitioner's Fifth Amendment right against self-incrimination.

27

### 1.  Procedural Default

Respondent argues that Petitioner procedurally defaulted the instant claim because he failed to raise it on direct review and because, when he raised it on state collateral review, the state appellate courts rejected the claim pursuant to Michigan Court Rule 6.508(D).  As Respondent notes, in *Simpson v. Jones*, 238 F.3d 399, 407-08 (2002), the Sixth Circuit held that the Michigan Supreme Court's reliance on Rule 6.508(D) in its decision was sufficient for a federal habeas court to conclude that the decision rested on an adequate and independent state procedural bar.  Recently, however, the Sixth Circuit held that a claim is not procedurally defaulted where the Michigan Supreme Court relies upon Rule 6.508(D) without a clear and express invocation of a procedural bar and where the lower state courts adjudicated the petitioner's claim on the merits.  *See Abela v. Martin*, 380 F.3d 915 at 921-24 (6th Cir. 2004).

The Michigan Court of Appeals and the Michigan Supreme Court addressed Petitioner's ineffective-assistance-of-trial-counsel claim in single-sentence orders stating that Petitioner had failed to establish entitlement to relief under Rule 6.508(D).  The trial court, however, neither mentioned Rule 6.508(D) nor any other procedural bar when ruling on the instant claim; rather, it adjudicated the claim on the merits.  Thus, the Michigan appellate courts, which did not expressly invoke a procedural bar, may have denied Petitioner's ineffective-assistance-of-trial-counsel claim for non-procedural reasons.  The Court concludes that the instant claim is not subject to procedural default, and will proceed to address it on the merits.[14]

---

[14]  Having determined that Petitioner's final claim is not procedurally defaulted, the Court finds it unnecessary to address Petitioner's argument under *Massaro v. United States*, 538 U.S. 500 (2003), that ineffective-assistance-of-counsel claims may be raised for the first time on collateral review.  *Massaro* is irrelevant, in any event, because it concerned a federal prisoner's failure to raise an ineffectiveness claim on direct review.  *See id.* at 509 (holding that a federal

## 2.  Merits

Petitioner alleges that he informed his first trial attorney, Anthony Walton ("Walton"), of the coercive circumstances surrounding his statements to the police, that the police had denied his request for counsel, and, thus, that his statements were involuntary.  According to Petitioner, although Walton initially filed a motion to suppress Petitioner's statements, Walton inexplicably withdrew the motion without Petitioner's consent.

The trial court determined that this claim lacked merit.  To prevail on habeas review, Petitioner must demonstrate that the trial court's conclusion was an unreasonable application of *Strickland v. Washington*.  *Cyars,* 383 F.3d at 491.  As noted above, the two-prong *Strickland* test for attorney ineffectiveness is: 1) deficient performance; and 2) resulting prejudice.  *Strickland,* 466 U.S. at 687.  An attorney's performance is deficient if "counsel's representation fell below an objective standard of reasonableness."  *Id.* at 688.  The defendant must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  *Id.* at 687.  An attorney's deficient performance is prejudicial if "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."  *Id.*  The defendant must show "a reasonable probability[, which is a probability that is sufficient to undermine confidence in the proceeding's outcome,] that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id.* at 694.

"Judicial scrutiny of counsel's performance must be highly deferential."  *Id.* at 689.

---

prisoner's "failure to raise an ineffective-assistance-of-counsel claim on direct appeal does not bar the claim from being brought in a later, appropriate proceeding under [28 U.S.C.] § 2255").

Because of the difficulties inherent in evaluating defense counsel's performance, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. . . ." *Id.* (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).

The record indicates that, during oral argument on pretrial motions, Walton requested a *Walker* hearing, and the trial court instructed Walton to provide the prosecutor with the names of the witnesses that Walton wished to present at the hearing.[15]   (Tr. June 29, 1990, at 19-20). The record is silent on whether Walton attempted to secure such witnesses or why, as Petitioner alleges, Walton abandoned his efforts to have Petitioner's statements suppressed.

However, as discussed above, the record does not support Petitioner's allegation that his statements were involuntary.  Officer Stawiasz testified at trial that, before taking Petitioner's first statement, Petitioner read one of his constitutional rights to demonstrate that he could read and write, and Officer Stawiasz then advised Petitioner of the remainder of his constitutional rights, including his rights to remain silent and to have an attorney present.  (Tr. Oct. 24, 1990 at 114.)  Petitioner, a high school graduate, stated that he understood each constitutional right as it was read aloud and that he had no questions regarding any of those rights.  (*Id.* at 114.)  Waiving his constitutional rights, Petitioner stated that his statement was freely and voluntarily given and that he was neither threatened nor promised anything to give the statement.  (*Id.* at 116.)

On the following morning, Officer Stawiasz again advised Petitioner of his constitutional rights, each of which Petitioner initialed as having been understood.  (*Id.* at 123.)  Waiving his constitutional rights, Petitioner stated that he was giving his statement freely and voluntarily.

---

[15]  In Michigan, hearings on the voluntariness of a defendant's confession are referred to as a *Walker* hearing.  *See People v. Walker*, 374 Mich. 331 (1965).

(*Id.* at 124.)  When Officer Stawiasz asked Petitioner whether he had been threatened or promised anything to give another statement, Petitioner responded, "No, I want to tell the truth." (*Id.*)  After giving his second statement to Officer Stawiasz, Petitioner stated that he had not told the truth in his first statement because he "didn't want to tell on . . . [his] friend."  (*Id.* at 128.)

On the next day, Officer Stawiasz advised Petitioner of his constitutional rights, each of which Petitioner initialed as having been understood.  (*Id.* at 131.)   Waiving his constitutional rights, Petitioner stated that he was giving his statement freely and voluntarily and that he had not been threatened or promised anything to give the statement.  (*Id.* at 132.)   When Officer Stawiasz asked why Petitioner wanted to give a statement, Petitioner stated that he "didn't tell the truth in the other statements . . . because . . . [he] was scared."  (*Id.*)  Petitioner affirmed that he did not want an attorney present.  (*Id.*)  Petitioner then confessed to shooting Chaney.  (*Id.* at 135.)  After giving his statement, Petitioner read the statement, initialed each page, and stated that he did not wish to make any changes to it.  (*Id.* at 138.)

The record does not support Petitioner's allegation that he requested, but was denied, counsel.  The record also belies Petitioner's contention that the police continuously menaced him until he admitted his involvement in the shooting.  At the time of each statement, Petitioner stated that he was freely and voluntarily speaking with Officer Stawiasz.  Although he now claims, without any evidentiary support, that he was deprived of food and water for over fifty hours, Officer Stawiasz testified that Petitioner was sent back to lock-up between statements. Two pictures taken of Petitioner during the interrogation process were admitted during trial. While the pictures indicate that Petitioner was forced to wear the same clothes for the three days that he was held in lock-up, they do not evidence any mistreatment of Petitioner.  (*Id.* at 139-41.)

31

Indeed, Petitioner's ability to give such detailed factual narratives in his statements undermines the alleged mistreatment.

Because police misconduct did not produce Petitioner's statements, they need not have been suppressed. *McCall v. Dutton*, 863 F.2d 454, 459 (6th Cir. 1988). Therefore, trial counsel's failure to pursue a motion to suppress Petitioner's statements did not prejudice Petitioner's trial. The trial court's denial of Petitioner's ineffective-assistance-of-trial-counsel claim was not an unreasonable application of clearly-established federal law.

In sum, the Court DENIES Petitioner's application for a writ of habeas corpus.

### III.  CERTIFICATE OF APPEALABILITY

A petitioner may appeal a district court's denial of his petition for a writ of habeas corpus only upon the issuance of a certificate of appealability. 28 U.S.C. § 2253(c)(1)(B); Fed. R. App. P. 22(b). A petitioner must make "a substantial showing of the denial of a constitutional right" for a certificate of appealability to issue. 28 U.S.C. § 2253(c)(2). A petitioner satisfies this substantial-showing threshold upon demonstrating "that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel,* 529 U.S. 473, 484 (2000).

"When a habeas applicant seeks permission to initiate appellate review of the dismissal of his petition," the district court should "limit its examination to a threshold inquiry into the underlying merit of his claims." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). The Court must either issue a certificate of appealability indicating which issues satisfy the requisite showing or provide the reasons why such a certificate should not issue. 28 U.S.C. § 2253(c)(3); Fed. R. App. P. 22(b); *In re Certificates of Appealability*, 106 F.3d 1306, 1307 (6th Cir. 1997).

The Court concludes that reasonable jurists could find debatable or wrong the Court's assessment of Petitioner's claims regarding his right of confrontation, his right to due process of law, and his rights to the effective assistance of trial and appellate counsel, as set forth in his first, second, third, and fifth claims, respectively. *See Slack*, 529 U.S. at 484. The Court notes, however, that "a claim can be debatable even though every jurist of reason might agree, after the [certificate of appealability] has been granted and the case has received full consideration, that [the] petitioner will not prevail." *Miller-El,* 537 U.S. at 338. The Court, therefore, GRANTS a certificate of appealability on Petitioner's first, second, third, and fifth claims.

The Court concludes that reasonable jurists could not find debatable or wrong the Court's assessment of Petitioner's Fourth Amendment claim, as set forth in his fourth claim. *See Slack*, 529 U.S. at 484. The Court, therefore, DECLINES to issue a certificate of appealability on Petitioner's fourth claim.

## IV.  RENEWED MOTION

Remaining before the Court is Petitioner's renewed motion for an evidentiary hearing and for the appointment of counsel. In that motion, Petitioner seeks an evidentiary hearing for purposes of his ineffective-assistance-of-appellate-counsel and Fourth Amendment claims, or his third and fourth claims, respectively. Specifically, Petitioner seeks an evidentiary hearing on the failure of appellate counsel, at the post-conviction evidentiary hearing, to raise the inaccuracies in Cannon's description of "Head" and the car involved in the shooting and on whether the police, in fact, lacked the requisite probable cause to arrest Petitioner.

Having denied Petitioner's third claim on the ground that appellate counsel's failure to raise the discrepancies in Cannon's description did not prejudice Petitioner's appeal, and having

found that the Court is precluded from reviewing Petitioner's Fourth Amendment claim on the merits, the Court DENIES Petitioner's motion for an evidentiary hearing.  Having determined that Petitioner's claims do not warrant the issuance of a writ of habeas corpus, the Court DENIES Petitioner's motion for the appointment of counsel.

### V.  SUMMARY

For the preceding reasons, the Court:

1)      DENIES Petitioner's application for a writ of habeas corpus;

2)      GRANTS a certificate of appealability as to Petitioner's first, second, third, and fifth claims, but DENIES a certificate of appealability as to Petitioner's fourth claim; and

3)      DENIES Petitioner's renewed motion for an evidentiary hearing and for the appointment of counsel.

s/Paul D. Borman
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated:  May 31, 2005

CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record by electronic means or U.S. Mail on May 31, 2005.

s/Jonie Parker
Case Manager